UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION AT LEXINGTON

MADDILYN MARCUM, on behalf of herself
and all others similarly situated,

Plaintiff

v.

COOKIE CREWS, in her official capacity as
Commissioner of the Ky. Department of
Corrections; DENISE BURKETT, in her
official capacity as Director of Ky. Dept. of
Corrections' Division of Medical Services;
APPALACHIAN REGIONAL
HEALTHCARE, INC.,

Defendants

Case No. 5:25-cv-00238-GFVT

*Electronically filed*

## MOTION FOR A TEMPORARY RESTRAINING ORDER
## AND A PRELIMINARY INJUNCTION

Pursuant to Fed. R. Civ. P. 65(a), (b), 18 U.S.C. § 3626(2), and LR 7.1, Plaintiff moves for

a temporary restraining order and a preliminary injunction in the above-styled action. In support

of this motion, Plaintiff states as follows:

### INTRODUCTION

Plaintiff brings this action on behalf of herself and on behalf of a class of similarly-situated

incarcerated individuals under 42 U.S.C. § 1983 challenging, on Eighth and Fourteenth

Amendment grounds, Kentucky's statutory ban on public funds being used to provide Hormone

Replacement Therapy ("HRT") for Kentucky prisoners (the "Public Funds Ban"), codified at

Kentucky Revised Statute ("KRS") § 197.280(2) and (3).[1] Plaintiff alleges that enforcement of this Public Funds Ban constitutes deliberate indifference to the serious medical needs of herself and the proposed class, both facially and as-applied, because it operates as a blanket termination of previously prescribed (or refusal to provide in the first instance) HRT for an objectively serious medical condition, Gender Dysphoria, despite the known substantial risk of harm that will result from doing so. [Class Action Complaint ("Compl."), at ¶¶ 1, 4, 19-27, 52-84.]

## STATEMENT OF FACTS

### Background On Gender Dysphoria

At birth, infants are assigned a sex, either male or female, based on the appearance of their external genitalia. [Compl., at ¶¶ 16-17; Declaration of Dr. Dan H. Karasic ("Karasic Decl.") *attached* as Ex. 1, at ¶ 32.] For most people, their assigned sex correlates to their gender identity. But one's sex is more complicated and multifactorial, in that other factors beyond external genital characteristics also play a role such as chromosomes, endogenous hormones, gonads, gender identity, and variations in brain structure and function. And for transgender individuals, their assigned sex does not align with their gender identity. [Compl, at ¶ 17; Karasic Decl., at ¶ 37.] Indeed, based on data from the Williams Institute, approximately 0.6% of the United States population age 13 or older, or about 1.6 million people, identify as transgender. [Karasic Decl., at ¶ 40.] *See also United States v. Skrmetti*, 605 U.S. --, 2025 WL 1698785, at *4 (U.S. June 18, 2025) (noting that "[a]n estimated 1.6 million Americans over the age of 13 identify as transgender, meaning that their gender identity does not align with their biological sex.").

---

[1]     Plaintiff and the Plaintiff Class do not challenge the ban on public funds being used to provide gender reassignment surgery for incarcerated individuals contained in the statute. [Class Action Complaint ("Compl."), at ¶ 1 n.2.]

"Some transgender individuals suffer from gender dysphoria, a medical condition characterized by persistent, clinically significant distress resulting from an incongruence between gender identity and biological sex. Left untreated, gender dysphoria may result in severe physical and psychological harms." *Skrmetti*, 2025 WL 1698785, at *4. Thus, Gender Dysphoria is a serious medical condition that is a recognized diagnosis in the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders (DSM-5-TR), and it has been for decades. [Compl., at ¶ 18-21; Karasic Decl., at ¶ 45.] *See also Campbell v. Kallas*, 936 F.3d 536, 551–52 (7th Cir. 2019) ("We recognized in 1997 that gender dysphoria is a serious psychiatric disorder. It has thus been established for more than 20 years that gender dysphoria is a serious medical need.") (cleaned up).

In the DSM-5-TR, the diagnosis of Gender Dysphoria in Adolescents and Adults involves two major diagnostic criteria:

A.    A marked incongruence between one's experienced/expressed gender and assigned gender, of at least 6 months duration, as manifested by at least two of the following (one of which must be Criterion A1):

    1.    A marked incongruence between one's experienced/expressed gender and primary or secondary sex characteristics.
    2.    A strong desire to be rid of one's primary and/or secondary sex characteristics because of a marked incongruence with one's experienced/expressed gender.
    3.    A strong desire for the primary and/or secondary sex characteristics of the other gender.
    4.    A strong desire to be of the other gender (or some alternative gender different from one's assigned gender).
    5.    A strong desire to be treated as the other gender (or some alternative gender different from one's assigned gender).
    6.    A strong conviction that one has the typical feelings and reactions of the other gender (or some alternative gender different from one's assigned gender).

B.    The condition is associated with clinically significant distress or impairment in social, occupational, or other important areas of functioning.

3

[Karasic Decl., at ¶ 46.]

Gender Dysphoria is amenable to treatment, and the prevailing treatment for it is highly effective. If left untreated, however, Gender Dysphoria can cause significant harm to the patient, including a significantly increased risk of depression, anxiety, self-harm, and suicidality. [Compl., at ¶ 22, 26-27; Karasic Decl., at ¶ 48.] Moreover, untreated Gender Dysphoria can also impair individuals' ability to function in other aspects of life. But these risks decline when transgender individuals live according to their gender identity and have access to medically-indicated care, including HRT. [*Id*. at ¶ 48-49.] Indeed, well-documented scientific research and clinical experience have demonstrated that social transition and gender-affirming medical care, which includes HRT, can significantly relieve the distress and associated physical and psychological harms from untreated Gender Dysphoria. [Compl., at ¶ 23-25; Karasic Decl., at ¶ 28.]

For individuals for whom gender-affirming medical care is indicated, there are no alternative evidence-based treatments. [Karasic Decl., at ¶ 29, 66.] Moreover, barring people with Gender Dysphoria from socially transitioning, and withdrawing or denying gender-affirming medical care to those for whom it is indicated, creates a substantial risk of significant harm to their health and well-being, including heightened risk of self-harm and suicidality. [Compl., at ¶ 26-27; Karasic Decl., at ¶ 30.]

To be sure, social transition alone can adequately address the distress associated with Gender Dysphoria for some people. [Karasic Decl., at ¶ 63.] But for others, they cannot obtain relief from the clinically significant distress without also receiving medical interventions to align the body with their gender identity. [*Id.*] In accordance with the WPATH SOC 8 and the Endocrine Society Guidelines, medical interventions to treat adults with gender dysphoria include HRT based on a patient's individual needs. [Compl., at ¶ 23-25; Karasic Decl., at ¶ 65.] Moreover, gender-

affirming medical interventions provided in accordance with the WPATH SOC 8 and Endocrine Society Guidelines are widely recognized in the medical community as safe, effective, and medically necessary for many people with Gender Dysphoria. [Compl., at ¶¶ 23-25; Karasic Decl., at ¶ 74.]

### KRS § 197.280(2) and (3)—Public Funds Ban

KRS § 197.280(2) provides that "*public funds shall not be directly or indirectly used*, granted, paid, or distributed *for the purpose of providing a cosmetic service or elective procedure to an inmate in a correctional facility*." (Emphasis added). Relevant to this action, "cosmetic service or elective procedure" includes "[p]rescribing or administering cross-sex hormones in amounts greater than would normally be produced endogenously in a healthy person of the same age and sex." KRS § 197.280(1)(a)(1). Thus, KRS § 197.280(2)'s ban on public funds being used for "cosmetic service[s] or elective procedure[s]" applies to HRT as a treatment for Gender Dysphoria. Moreover, "public funds" is broadly defined to include "any money, regardless of the original source of the money, of: [t]he Commonwealth of Kentucky or any department, agency, or instrumentality thereof; [a]ny county, city, local school district, or special district, or any department, agency, or instrumentality thereof; and [a]ny other political subdivision of the Commonwealth or any department, agency, or instrumentality thereof." KRS § 197.280(1)(b)(1)-(3).

The Public Funds Ban on HRT care for Gender Dysphoria does contain an "exception" where "a health care provider has initiated a course of treatment . . .and the health care provider determines . . .that immediately terminating the use of the drug or medication would cause physical harm to the inmate." KRS § 197.280(3). However, this "exception" is merely temporary, in that it permits the use of public funds for HRT (upon the requisite showing of harm), but only for a

limited period of time "during which the inmate's use of the drug or hormone is systematically reduced and eliminated." KRS § 197.280(3).

### Impact Of The Public Funds Ban On HRT Care

Prior to passage of the Public Funds Ban, DOC allowed individuals diagnosed with Gender Dysphoria to receive HRT treatment under the care of a licensed medical provider. [Compl., at ¶¶ 38-40.] But the manner in which it did so evolved over time. Specifically, Plaintiff had been diagnosed with Gender Dysphoria and placed on a regime of HRT treatment for approximately five years prior to the events that led to her incarceration in 2014. [Compl., at ¶ 35-36; Declaration of Maddilyn Marcum ("Plaintiff Decl."), attached as Ex. 2, at ¶¶ 3-5.] However, when DOC assumed custody of Plaintiff in 2015, it refused to allow her to receive HRT treatment under its then-operative "freeze frame" policy. [Plaintiff Decl., at ¶¶ 8-9.] Under that policy, DOC authorized HRT care for transgender prisoners but *only* if they were receiving HRT treatment *when they entered DOC's custody*. [*Id*. at ¶ 9.] And because the county jail had refused to provide Plaintiff with HRT during her pretrial incarceration there, DOC took the position that Plaintiff did not qualify to receive HRT care. [*Id*.]

But DOC changed its position in 2016 after its Health Care Administration Review Team reviewed Plaintiff's case and agreed that her HRT treatment should be provided. [*Id*. at ¶ 10.] So, in 2016, DOC's medical providers prescribed HRT to treat Plaintiff's Gender Dysphoria, and DOC allowed her to resume HRT treatment at that time. [Compl., at ¶ 38; *id*. at ¶ 10.] Thereafter, Plaintiff's HRT treatment for Gender Dysphoria went undisturbed from 2016 until May 2025 - shortly after the passage of the Public Funds Ban. [Compl., at ¶¶ 39, 41; Plaintiff Decl., at ¶ 13.]

Moreover, at the time the Kentucky General Assembly debated passage of the Public Funds Ban, there were sixty-six other DOC inmates also receiving HRT to treat their Gender Dysphoria

6

besides Plaintiff. [Compl., at ¶ 6 (citing AUSTIN SCHICK, *Committee approves bill banning hormone treatment and gender reassignment*, Spectrum News 1 (Feb. 14, 2025), available at https://spectrumnews1.com/ky/louisville/news/2025/02/13/inmate-gender-services-bill (last visited June 3, 2025)).]

After the General Assembly enacted the Public Funds Ban (but one month before its effective date), Defendant ARH's employee, APRN Bonnie Ferguson, notified Plaintiff on May 28, 2025 that the HRT treatment she had been receiving (under the care of APRN Ferguson and Dr. Uy) would be reduced by one-half starting in August, 2025, and that it would be completely eliminated in November, 2025 due to the Public Funds Ban. [Compl., at ¶ 41; Plaintiff Decl., at ¶ 13.] The Public Funds Ban will likewise result in the reduction and termination of HRT care for the other sixty-six individuals in DOC's custody who have been receiving it to treat their Gender Dysphoria. [Compl., at ¶¶ 62-72.] And it will also deprive all future individuals in DOC's custody who are diagnosed with (or who meet the criteria for) Gender Dysphoria and for whom HRT care is medically indicated from receiving that treatment. [*Id.*]

## ARGUMENT

## I.    PLAINTIFF AND THE CLASS ARE ENTITLED TO A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTIVE RELIEF.

In weighing whether to grant preliminary injunctive relief under Fed. R. Civ. P. 65(a), "district court[s] must consider: (1) the plaintiff's likelihood of success on the merits; (2) whether the plaintiff may suffer irreparable harm absent the injunction; (3) whether granting the injunction will cause substantial harm to others; and (4) the impact of an injunction upon the public interest." *Abney v. Amgen, Inc.*, 443 F.3d 540, 546 (6th Cir. 2006) (internal quotations omitted) (quoting *Deja Vu of Nashville, Inc. v. Metro. Gov't of Nasvhille & Davidson Co.*, 274 F.3d 377, 400 (6th Cir. 2001) *cert. denied*, 535 U.S. 1073 (2002)).  These considerations "are factors to be balanced,

not prerequisites that must be met." *Jones v. City of Monroe, MI*, 341 F.3d 474, 476 (6th Cir. 2003) (citing *In re Delorean Motor Co.*, 755 F.2d 1223, 1228 (6th Cir. 1985)). And while no single factor is dispositive, "a preliminary injunction issued where there is simply no likelihood of success on the merits must be reversed." *Mich. State v. Miller*, 103 F.3d 1240, 1249 (6th Cir. 1997).

Similarly, whether (or not) to grant a temporary restraining order ("TRO") under Rule 65(b) requires courts to consider "the same four factors applicable to a motion for preliminary injunction." *Dinter v. Miremami*, 627 F. Supp. 3d 726, 730 (E.D. Ky. 2022) (citing *McGirr v. Rehme*, 891 F.3d 603, 610 (6th Cir. 2018)). But while the same 4-part analysis applies, "there is increased emphasis on irreparable harm" in deciding TROs. *Id.* (citing *ABX Air, Inc. v. Int'l Bhd. of Teamsters, Airline Div.*, 219 F. Supp. 3d 665, 670 (S.D. Ohio 2016)).

As is explained below, all of the requisite elements for granting the requested injunctive relief are met in this case.

### A.    There Is A Substantial Likelihood That Plaintiff Will Succeed On The Merits Of Her Claims.

The Eighth Amendment's ban on cruel and unusual punishment, as incorporated by the Fourteenth Amendment, bans state actors "from wantonly inflicting pain on prisoners." *Phillips v. Tangilag*, 14 F.4th 524, 534 (6th Cir. 2021) (citing *Whitley v. Albers*, 475 U.S. 312, 319 (1986)). This extends to denying adequate medical treatment. *See Brown v. Plata*, 563 U.S. 493, 510-11 (2011) ("Just as a prisoner may starve if not fed, he or she may suffer or die if not provided adequate medical care. A prison that deprives prisoners of basic sustenance, including adequate medical care, is incompatible with the concept of human dignity and has no place in civilized society.") And in that context, courts apply a two-part test consisting of both an objective and subjective component. As to the former, courts look to whether the inmate faced "a risk of sufficiently serious harm" from the deficient care. *Phillips*, 14 F.4th at 534 (citing *Farmer v.*

*Brennan*, 511 U.S. 825, 834 (1970)). Thus, the prisoner must show that she has an objectively "serious" medical need. *Id*. at 534 (citing *Estelle v. Gamble,* 429 U.S. 97, 103–04 (1976)). The existence of "[a] serious medical need alone can satisfy this objective element if doctors effectively provide no care for it." *Id*. (citing *Rhinehart v. Scutt*, 894 F.3d 721, 737 (6th Cir. 2018)). But where some care is provided, the prisoner must also establish that the allegedly deficient care "is so grossly incompetent or so grossly inadequate as to shock the conscience or be intolerable to fundamental fairness." *Id*. at 535 (cleaned up).

The subjective component requires that the state official must "know of and disregard the serious medical need." *Id*. (citing *Farmer*, 511 U.S. at 834, 838–39). This generally requires that the inmate show that the official knew "of the facts that show the serious medical need and [] personally conclude[d] that this need exists," and that the official then "consciously disregard[ed]" the need. *Id*. (citing *Jones v. Muskegon County,* 625 F.3d 935, 941 (6th Cir. 2010)). This "deliberate indifference" analysis lies "somewhere between the poles of negligence. . . and purpose or knowledge . . ." *Farmer*, 511 U.S. at 836. But even though this requires establishing "consciousness of a risk," it does not require showing that the official "acted or failed to act believing that harm would befall an inmate; it is enough that the official failed to act despite his knowledge of a substantial risk of serious harm." *Id*. at 842. Moreover, "a factfinder may conclude that a prison official knew of a substantial risk from the very fact that it was obvious." *Id*. And acting in compliance with a law or policy does not preclude a finding that the official was deliberately indifferent. *See Johnson v. Sanders*, 121 F.4th 80, 92 (10th Cir. 2024) ("Where a defendant has subjective knowledge that a course of action or inaction required by policy creates or fails to address a serious risk to an inmate's health or safety, he may not escape constitutional liability by disregarding such risk in compliance with the policy. In such circumstances, the

Constitution demands more of state actors charged with overseeing the carceral punishment of a convicted prisoner.").

Here, Plaintiff and the proposed class have a substantial likelihood of success on the merits because both the objective and subjective elements of their Eighth Amendment claims are met.

### 1.    Gender Dysphoria is an objectively serious medical need.

First, Gender Dysphoria is an objectively serious medical need, as other courts have found (or assumed) and as government officials have conceded in other jurisdictions.[2] *See, e.g, Johnson v. Sanders*, 121 F.4th 80, 89 (10th Cir. 2024) (assuming, without deciding, that gender dysphoria a serious medical need under the Eighth Amendment); *Edmo v. Corizon, Inc.*, 935 F.3d 757, 785 (9th Cir. 2019) ("The State does not dispute that Edmo's gender dysphoria is a sufficiently serious medical need to trigger the State's obligations under the Eighth Amendment. Nor could it. Gender dysphoria is a serious ... medical condition that causes clinically significant distress—distress that impairs or severely limits an individual's ability to function in a meaningful way.") (cleaned up); *Gibson v. Collier*, 920 F.3d 212, 219 (5th Cir. 2019) ("Here, the State of Texas does not appear to contest that Gibson has a serious medical need, in light of his record of psychological distress, suicidal ideation, and threats of self-harm [from a gender dysphoria diagnosis]"); *Mitchell v. Kallas*, 895 F.3d 492, 498 (7th Cir. 2018) (in Eighth Amendment deliberate indifference case, noting that the "state defendants do not dispute that Mitchell's gender dysphoria is a serious medical condition").

---

[2]    Indeed, almost thirty years ago the Sixth Circuit Court of Appeals in an unpublished decision also concluded that "a complete refusal by prison officials to provide [an inmate] with any treatment [for gender dysphoria] at all would state an Eighth Amendment claim for deliberate indifference to medical needs." *Murray v. U.S. Bureau of Prisons*, 106 F.3d 401 (Table), 1997 WL 34677, at *3 (6th Cir. 1997) (unpublished).

This conclusion is supported by the distinguishing characteristics of the diagnosis itself, which include "clinically significant distress or impairment in social, occupational, or other important areas of functioning." DSM-5-TR. [*See also* Karasic Decl., at ¶ 46.] Indeed, the Ky. Department of Corrections has recognized it as a serious medical for many years and has, through its medical providers, treated the condition by prescribing Plaintiff and sixty-six other individuals HRT care for it. [Compl., at ¶¶ 1, 20-21, 37-40; Plaintiff Decl., at ¶¶ 10, 15.] *See also* SARAH LADD, *Ban on public funds for KY prisoners' transgender care becomes law without Besehar's signature*, Kentucky Lantern (Mar. 26, 2025), at https://kentuckylantern.com/briefs/ban-on-public-funds-for-ky-prisoners-transgender-care-becomes-law-without-beshears-signature/ (last visited July 2, 2025). Thus, Gender Dysphoria is a "medical need [that] is sufficiently serious" because "it has "been diagnosed by a physician as mandating treatment." *Smith v. Franklin Cnty.,* 227 F. Supp. 2d 667, 676 n. 10 (E.D. Ky. 2002) (cleaned up); *Phillips v. Tangilag*, 14 F.4th 524, 534 (6th Cir. 2021) (noting that an objectively serious medical need can be shown where "a doctor has diagnosed a condition as requiring treatment or that the prisoner has an obvious problem that any layperson would agree necessitates care.") (citing *Burgess v. Fischer*, 735 F.3d 462, 476 (6th Cir. 2013)).

### 2.    The Public Funds Ban deprives Plaintiff and the class of adequate medical care.

Moreover, the Public Funds Ban for HRT care operates as a *complete denial of treatment* for Gender Dysphoria for Plaintiff and the class given that: (a) they are individuals for whom such care is medically indicated, (b) they have been prescribed and received HRT care under the supervision of licensed healthcare professionals while in DOC's custody, (c) the HRT care they have been receiving has been (or imminently will be) permanently terminated as a result of Defendants' enforcement of KRS § 197.280 as opposed to the exercise of medical judgment or any

patient-specific considerations, and (d) there is no clinically significant alternative to HRT treatment for those for whom it is medically indicated. [Compl., at ¶¶ 1, 4,6, 22-27, 30-32, 41; Plaintiff Decl., at ¶¶ 13-16; Karasic Decl., at ¶¶ 28-31, 63-66, 77-81.] In this regard, then, the *permanent* cessation of care (previously determined to be necessary and adequate by healthcare providers) for non-medical reasons constitutes a complete denial of care. *See, e.g.*, *Parks v. Blanchette*, 144 F. Supp. 3d 282, 313 (D. Conn. 2015) (finding that cessation of HIV/AIDS medication for ten months did not constitute a "complete denial of treatment" under the Eighth Amendment because it was "temporary" and accompanied by monitoring, and thus more properly analyzed as an "interruption in care"). Indeed, courts have found blanket prohibitions on gender affirming care, including HRT, a complete denial of care that satisfies this component. *See, e.g., Jones v. Bondi*, No. 25-cv-401-RCL, 2025 WL 923755, at *2 (D.D.C. Mar. 3, 2025), appeal pending, No. 25-5101 (D.C. Cir.) (granting preliminary injunction against BOP blanket ban on HRT); *Keohane v. Fla. Dep't of Corr. Sec'y,* 952 F.3d 1257, 1266-1267 (11th Cir. 2020); *Fields v. Smith*, 653 F.3d 550, 559 (7th Cir. 2011)); *Hicklin v. Precynthe*, No. 16-CV-01357, 2018 WL 806764, at *11-13 (E.D. Mo. Feb. 9, 2018) (granting preliminary injunction where health care provider had policy of refusing to provide HRT).

### 3. Defendants are aware of the subjective medical need posed by Gender Dysphoria, and they are consciously disregarding the risk of harm posed by complying with the Public Funds Ban on HRT care.

Because this action asserts only official capacity claims against DOC officials and a *Monell* claim against a corporate entity, application of the Eighth Amendment's "subjective" element is less focused on Defendants' personal conscious disregard of the risk of harm, and more on the institutional knowledge (and disregard) of it. *See, e.g., Hadix v. Johnson*, 367 F.3d 513, 526 (6th Cir. 2004) ("In this case, we are concerned with future conduct to correct prison conditions. If

12

those conditions are found to be objectively unconstitutional, then that finding would also satisfy the subjective prong [of the deliberate indifference standard] because the same information that would lead to the court's conclusion was available to the prison officials."); *Castro v. Cnty. of Los Angeles*, 833 F.3d 1060, 1076 (9th Cir. 2016) ("The Supreme Court has strongly suggested that the deliberate indifference standard for municipalities is always an objective inquiry.").

Here, the evidence adequately establishes sufficient subjective awareness and conscious disregard of the medical need posed by Plaintiff's and the proposed class's Gender Dysphoria diagnosis and the risks of harm created by failing to treat it with HRT because: (a) DOC previously withheld HRT care from Plaintiff in 2015, but it reversed course the following year after its Health Care Administration Review Team reviewed Plaintiff's case and agreed that her HRT treatment should be resumed [Compl., at ¶ 38-40]; (b) since 2016, Plaintiff received HRT care under the supervision of DOC-provided healthcare providers while in DOC's custody [*id*.]; (c) as of 2025, sixty-seven (67) individuals in DOC's custody, including Plaintiff, were receiving HRT care to treat their Gender Dysphoria; and (d) ARH, through its employees Dr. Uy and APRN Ferguson, have been providing HRT care to treat Plaintiff's (and other inmates') Gender Dysphoria. [*Id*. at ¶¶ 15, 40-41.]

Moreover, Defendants' enforcement of KRS § 197.280(2) and (3) by reducing and terminating HRT care for Plaintiff and the entire class constitutes a cessation (for non-medical reasons) of medical care that has been prescribed by a licensed healthcare provider to ameliorate the risks of severe harm associated with failing to treat Gender Dysphoria. Such intentional termination of already-prescribed treatment for non-medical reasons sufficiently establishes the subjective prong of the deliberate indifference standard. *See Estelle v. Gamble*, 429 U.S. 97, 104–05 (1976) ("We therefore conclude that deliberate indifference to serious medical needs of

13

prisoners constitutes the unnecessary and wanton infliction of pain proscribed by the Eighth Amendment. This is true whether the indifference is manifested by prison doctors in their response to the prisoner's needs or by prison guards in intentionally denying or delaying access to medical care or *intentionally interfering with the treatment once prescribed*.") (cleaned up); *Darrah v. Krisher*, 865 F.3d 361, 372 (6th Cir. 2017) ("We have previously held that when prison officials are aware of a prisoner's obvious and serious need for medical treatment and delay medical treatment of that condition for non-medical reasons, their conduct in causing the delay creates a constitutional infirmity.") (cleaned up); *Durham v. Kelley*, 82 F.4th 217, 230 (3d Cir. 2023) ("Indifference to a substantial risk of serious harm is manifested by an *intentional refusal to provide care, delayed medical treatment for non-medical reasons, denial of prescribed medical treatment*, or a denial of reasonable requests for treatment that leads to suffering or risk of injury.") (emphasis added); *Monmouth Cty. Corr. Institutional Inmates v. Lanzaro*, 834 F.2d 326, 346 (3d Cir. 1987) ("[I]f necessary medical treatment is delayed for non-medical reasons, a case of deliberate indifference has been made out." (citations omitted)); *Ancata v. Prison Health Servs., Inc.*, 769 F.2d 700, 704 (11th Cir. 1985) (same).

Nor does the fact that the Public Funds Ban is a statutory requirement absolve Defendants from Eighth Amendment liability. As noted in *Johnson,* 121 F.4th at 91–92, "[w]here a defendant has subjective knowledge that a course of action or inaction required by policy creates or fails to address a serious risk to an inmate's health or safety, he may not escape constitutional liability by disregarding such risk in compliance with the policy." Indeed, "although compliance with policy bears on a defendant's state of mind, it is not dispositive because correctional policy does not define the rights and obligations enshrined in the Constitution." *Id.*; *see also Mitchell v. Kallas*, 895 F.3d 492, 498 (7th Cir. 2018) ("Failing to provide care for a non-medical reason, when that

care was recommended by a medical specialist, can constitute deliberate indifference.") (citing *Perez v. Fenoglio*, 792 F.3d 768, 778 (7th Cir. 2015)).

### B.    Plaintiff and the class will be irreparably harmed absent an injunction

"Irreparable harm is an 'indispensable' requirement for a preliminary injunction, and in the absence of irreparable harm, injunctive relief cannot be granted." *Beckerich v. St. Elizabeth Med. Ctr.*, 563 F. Supp. 3d 633, 643 (E.D. Ky. 2021) (citing *D.T. v. Sumner Cnty. Schs.*, 942 F.3d 324, 326 (6th Cir. 2019)). To establish irreparable harm, a plaintiff must "show certain and immediate harm, not speculative or theoretical harm that would result in the absence of granting injunctive relief. *Id*. (cleaned up).

Here, that standard is met. Plaintiff has received notice of the imminent reduction and termination of her HRT healthcare due to KRS § 197.280(2) and (3), which also mandates the immediate or imminent termination of HRT care for all other class members by barring any direct or indirect use of public funds for it. [Compl., at ¶¶ 1, 4, 6, 24-27, 30-32, 45-46, 50; Plaintiff Decl., at ¶¶ 13-16.] This denial of gender-affirming HRT care for Plaintiff and the class, after having been prescribed it by licensed medical providers, has caused or will imminently cause (and will continue causing) irreparable harm in the form of: exacerbation of their Gender Dysphoria and the clinically significant distress associated with it, increased risk of depression, anxiety, self-harm (including attempts to self-castrate), and suicidality. [Plaintiff Decl., at ¶¶ 13-16; Karasic Decl., at ¶¶ 26, 30, 48, 68, 76, 79-82.] *See also Edmo*, 935 F.3d at 797-98 ("severe, ongoing psychological distress" and a "high risk of self-castration and suicide" constitute irreparable harm).

Further, absent the requested injunctive relief, Plaintiff and the class will also suffer irreparable harm *via* the deprivation of their Eighth Amendment rights that are at issue. *See, e.g.*, *Overstreet v. Lexington-Fayette Urb. Cnty. Gov't*, 305 F.3d 566, 578 (6th Cir. 2002) ("Courts have

also held that a plaintiff can demonstrate that a denial of an injunction will cause irreparable harm if the claim is based upon a violation of the plaintiff's constitutional rights."); *ACLU of Ky. v. McCreary Cnty., Kentucky*, 354 F.3d 438, 445 (6th Cir. 2003) ("[I]f it is found that a constitutional right is being threatened or impaired, a finding of irreparable injury is mandated. In other words, the first factor of the four-factor preliminary injunction inquiry—whether the plaintiff shows a substantial likelihood of succeeding on the merits—should be addressed first insofar as a successful showing on the first factor mandates a successful showing on the second factor— whether the plaintiff will suffer irreparable harm.").

### C.     The balance of hardships and public interest favor granting an injunction

The last two factors to consider in weighing whether to grant a TRO or preliminary injunction are: balance of hardships and whether the public interest is served. But these two factors "merge when the government is the defendant." *Commonwealth v. Biden*, 57 F.4th 545, 556 (6th Cir. 2023) (citing *Wilson v. Williams*, 961 F.3d 829, 844 (6th Cir. 2020)). And where, as here, plaintiff establishes "a substantial likelihood of success on the merits and imminent irreparable injuries," the government defendant "faces a high hurdle in showing that these factors warrant withholding relief." *Id.*

The balance of hardships strongly favors Plaintiff and the class because absent an injunction that blocks enforcement of the Public Funds Ban as it relates to HRT care, the harm Plaintiff and class members have suffered and will continue to suffer will be substantial. Every day without access to the necessary Gender Dysphoria treatment (that many, including Plaintiff, have been receiving for years) will exacerbate the clinically significant distress that accompanies the diagnosis, and it will further negatively impact their mental health as well as increase the risk

of suicidality and self-harm. [Compl., at ¶¶ 1, 4, 6, 24-27, 30-32, 45-46, 50; Plaintiff Decl., at ¶¶ 13-16; Karasic Decl., at ¶¶ 63, 65-67, 75-78.]

Conversely, neither the official capacity Defendants nor corporate Defendant will suffer any harm from abiding by their constitutional duty to provide medically necessary health care for Gender Dysphoria to Plaintiffs and the proposed class, as they were doing prior to the enactment of KRS § 197.280. "The [government's] responsibility to provide inmates with medical care ordinarily does not conflict with competing administrative concerns." *Hudson v. McMillian*, 503 U.S. 1, 6 (1992); *see also Kerr v. Holsinger*, 2004 WL 882203, at *10 (E.D. Ky. Mar. 25, 2004) (noting that "the balance of hardships favors Plaintiffs for the harm that the Defendants will suffer if an injunction is entered against them, in the form of financial costs, is clearly less than the harm that the Plaintiffs will suffer if their request is denied and they are denied medical treatment").

Finally, the public interest also weighs in favor of Plaintiff because the public has an interest in ensuring the continued dignity of incarcerated individuals, and "inherent in that dignity is the recognition of serious medical needs, and their adequate and effective treatment' pursuant to the Eighth Amendment's mandated standard of care." *Porretti v. Dzurenda*, 11 F.4th 1037, 1050 (9th Cir. 2021) (cleaned up). Moreover, "it is always in the public interest to prevent the violation of a party's constitutional rights." *G & V Lounge, Inc. v. Michigan Liquor Control Comm'n*, 23 F.3d 1071, 1079 (6th Cir. 1994) (citing *Gannett Co., Inc. v. DePasquale*, 443 U.S. 368, 383 (1979)); *see also Doe v. McHenry*, 763 F. Supp. 3d 81, 90 (D. D.C. 2025) (in granting TRO on behalf of transgender inmates, nothing that "it is hard to cognize of *any* public interest in the immediate cessation of their hormone therapy—aside, perhaps, from whatever small sum of money the [Bureau of Prisons] may save by ceasing administration of these drugs, or the abstract interest in the enforcement of Executive Branch policy decisions.").

**D.    The requested relief satisfies the requirements of the Prison Litigation Reform Act.**

In addition to being warranted under the traditional preliminary injunction factors, the requested injunctive relief is also consistent with the Prison Litigation Reform Act, which requires that:

> In any civil action with respect to prison conditions . . .the court may enter a temporary restraining order or an order for preliminary injunctive relief. Preliminary injunctive relief must be narrowly drawn, extend no further than necessary to correct the harm the court finds requires preliminary relief, and be the least intrusive means necessary to correct that harm. The court shall give substantial weight to any adverse impact on public safety or the operation of a criminal justice system caused by the preliminary relief and shall respect the principles of comity set out in paragraph (1)(B) in tailoring any preliminary relief. Preliminary injunctive relief shall automatically expire on the date that is 90 days after its entry, unless the court makes the findings required under subsection (a)(1) for the entry of prospective relief and makes the order final before the expiration of the 90-day period.

18 U.S.C.A. § 3626(a)(2).

Here, Plaintiff seeks injunctive relief to alleviate the imminent and ongoing harm posed by depriving her and the putative class of adequate healthcare for a serious medical need *that they have been receiving (in many instances for years) under the care of licensed healthcare providers* while incarcerated. [Compl., at ¶¶ 1, 4, 6, 26-27, 35-41; Plaintiff Decl., at ¶¶ 14-17.] Specifically, Plaintiff seeks an injunction barring Defendants, their agents, employees, and officials from enforcing KRS § 197.280(2) and (3) as it relates to HRT care. [*See attached* Proposed Order.] Plaintiff is not seeking injunctive relief to bar enforcement of the statute's proscription of sex-reassignment surgery, nor injunctive relief from the Court mandating that providers deliver specific healthcare. Rather, Plaintiff seeks only that limited injunctive relief enjoining enforcement of the Public Funds Ban as it relates to HRT thereby removing the statutory obstacle to Defendants being able to continue to provide (or to be able to provide in the first instance) HRT care for the treatment of Gender Dysphoria for those for whom it is medically indicated. *See, e.g.*, *Edmo v. Corizon, Inc.*,

18

935 F.3d 757, 783 (9th Cir. 2019); *Tay v. Dennison*, 457 F. Supp. 3d 657, 690 (S.D. Ill. 2020). The Court may enter class-wide injunctive relief either by provisionally certifying a class or based on its general equity powers. *Doe v. Burlew*, 740 F. Supp. 3d 576, 586-87 (W.D. Ky. 2024) (entering preliminary injunctive relief prohibiting enforcement of Kentucky statute against entire putative class); *Rodriguez v. Providence Providence Cmty. Corr., Inc.*, 155 F. Supp. 3d 758, 767 (M.D. Tenn. 2015). To the extent the Court believes provisional class certification is necessary, Plaintiff incorporates by reference Plaintiff's Motion for Class Certification [RE 3: Mot. to Certify Class], and for the same reasons supporting class certification, the court should provisionally certify the class and appoint Plaintiff's counsel as interim class counsel. In either event, the requested injunctive relief would, by necessity, apply statewide. But because DOC operate facilities across the Commonwealth, and because individuals diagnosed with Gender Dysphoria are housed at various state, county, and local facilities, the scope of the injunctive relief is still narrowly drawn and extends no further than necessary. *See, e.g.*, *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979) ("[T]he scope of injunctive relief is dictated by the extent of the violation established").

As such, there is no basis upon which to conclude that the requested injunctive relief would negatively impact either public safety or the operation of the criminal justice system given that: (a) DOC previously withheld HRT care from Plaintiff in 2015, but it reversed course in 2016 and Plaintiff has received HRT care under the supervision of DOC-provided licensed healthcare providers continuously since that time while in DOC's custody [Compl., at ¶¶ 38-40; Plaintiff's Decl., at ¶¶ 8-11.]; (b) as of 2025, sixty-seven (67) individuals in DOC's custody, including Plaintiff, were receiving HRT care to treat Gender Dysphoria [Compl., at ¶¶ 1, 6]; and (d) ARH, through its employees Dr. Uy and APRN Ferguson, have been providing HRT care to treat

19

Plaintiff's (and other inmates') Gender Dysphoria. [*Id.* at ¶¶ 1, 15, 39-41; Plaintiff's Decl., at ¶¶ 11, 13-17.]

Indeed, the resumption HRT care for Plaintiff and for those others for whom it is medically indicated could not jeopardize public safety because if that were the case, then Plaintiff and the proposed class members would not have received it for the past several years. Similarly, delivery of healthcare to Kentucky inmates has no impact upon the administration of the criminal justice system. It does, of course, carry with it administrative costs, but no more than have been born by the Defendants over the past several years since DOC recognized Gender Dysphoria as a serious medical need and HRT care a necessary and appropriate treatment for some who are diagnosed with it.

## II.    NO BOND SHOULD BE REQUIRED FOR THE INJUNCTION

Finally, Fed. R. Civ. P. 65(c) provides that a "court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." But as this court has noted, "[w]hile Rule 65 appears to require a security bond, the Court has discretion over whether to require the posting of security." *Tennessee v. Cardona*, 737 F. Supp. 3d 510, 571 (E.D. Ky. 2024) (citing *Moltan Co. v. Eagle-Picher Indus., Inc.*, 55 F.3d 1171, 1176 (6th Cir. 1995)).

Where, as here, plaintiffs establish a substantial likelihood of success on the merits and the public interest favors granting the requested injunctive relief, courts, including this one, often decline to require a security under Rule 65(c). *See, e.g.*, *id.* at 571 ("the Court concludes that no security is necessary in this matter due, in large part, to the strength of the plaintiffs' case and the strong public interest favoring the plaintiffs' positions."); *Parton v. Parton*, 2022 WL 2292984, at

*9 (E.D. Ky. June 24, 2022) (in declining to require bond under Rule 65(c), noting that the "strength of the movant's case and the public interest involved can weigh against requiring a bond."); *Dinter v. Miremami*, 627 F. Supp. 3d 726, 734 (E.D. Ky. 2022) (declining to require bond where TRO factors favor granting it and where plaintiff proceeding *in forma pauperis*); *Joseph v. Joseph*, 2015 WL 13861416, at *3 (E.D. Mich. Sept. 21, 2015). As in those instances, no bond should be required in this prisoner suit for declaratory and injunctive relief only.

## CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that the Court grant this Motion for a Temporary Restraining Order and a Preliminary Injunction.


Respectfully submitted,


/s William E. Sharp
William E. Sharp
Corey M. Shapiro
ACLU OF KENTUCKY FOUNDATION
325 W. Main Street, Suite 2210
Louisville, Kentucky 40202
(502) 581-9746 ext. 218
wsharp@aclu-ky.org
corey@aclu-ky.org
*Counsel for Plaintiff*

## CERTIFICATE OF SERVICE

I certify that on July 14, 2025, I sent this motion *via* Certified Mail, postage prepaid, along with the Complaint and Summons, to the following:

Cookie Crews, Commissioner
Ky. Department of Corrections
275 E. Main Street
Frankfort, Kentucky 40601

Denise Burkett, Director-Medical Services
Ky. Department of Corrections
275 E. Main Street
Frankfort, Kentucky 40601

Appalachian Regional Healthcare, Inc.
c/o Christi Lee, Registered Agent
ARH System Center-Hazard
101 Airport Gardens Road, Suite 305
Hazard, Kentucky 41701

/s William E. Sharp
William E. Sharp
ACLU OF KENTUCKY FOUNDATION

I further certify that on July 14, 2025, I sent this motion *via* electronic mail, along with the Complaint and Summons, to the following:

Leah Cooper Boggs, Acting General Counsel
Ky. Justice and Public Safety Cabinet
Leah.boggs@ky.gov

Allison R. Brown, Asst. General Counsel
Ky. Dept. of Corrections
Allison.brown@ky.gov

Russell Colemen, Attorney General
Commonwealth of Kentucky
servethecommonwealth@ky.gov

Christi Rhea Lee
Appalachian Regional Healthcare, Inc.
clee@arh.org

/s William E. Sharp
William E. Sharp
ACLU OF KENTUCKY FOUNDATION