UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
LEXINGTON

|  |  |  |
|---|---|---|
| MADDILYN MARCUM, | ) | |
| | ) | |
| Plaintiffs, | ) | Case No. 5:25-cv-00238-GFVT |
| | ) | |
| V. | ) | |
| | ) | **OPINION** |
| COMMISSIONER COOKIE CREWS, | ) | **&** |
| *et al.*, | ) | **ORDER** |
| | ) | |
| Defendants. | ) | |
| | ) | |

*** *** *** ***

The Kentucky Legislature passed Ky. Rev. Stat. § 197.280, which bans public funds from being used for hormone replacement therapy (HRT) for inmates. The Plaintiff, a prisoner receiving HRT, contends the ban has abrogated certain constitutional rights. So, the Plaintiff asks this Court to invalidate the statute.

In a modest way this is rightfully the business of the Court, but to understand the scope of this authority it is important to state first what the Court is not in the business of doing. To state the obvious point, the Court does not draft, vote on, or enact laws—that responsibility belongs to the Legislature. Alexander Hamilton referred to the Judiciary as the "least dangerous branch" of government, not because its decisions lack significance, but because it is not a creative body. That task lies with the Legislature. Instead, the judiciary is charged with interpreting and applying what already exists within its constitutional framework. This means even if a judge or a party disagrees with a law passed by the Legislature, absent a clear constitutional violation, courts should be reluctant to intervene, as they are neither designed nor equipped with the institutional tools necessary to legislate. All of this to say, the burden to necessitate judicial

intervention in an area typically reserved for the legislature is high. Apart from disagreeing with the statute, the Plaintiff has not shown at this preliminary stage a constitutional violation that warrants enjoining the enforcement Ky. Rev. Stat. § 197.280. Consequently, and for the reasons stated below, the Plaintiff's Motion for Preliminary Injunction [R. 4] is **DENIED**.

## I

The factual predicate in this case is complex, and at this early juncture, not fully developed. Plaintiff Maddilyn Marcum was diagnosed with Gender Dysphoria and placed on HRT five years prior to Marcum's incarceration. [R. 1 at 11.] To be clear, there is some disagreement between the parties over this fact. No such diagnosis letter has been entered into the record, nor do the Declarations of the ARH providers unequivocally state that Plaintiff Marcum has been diagnosed with Gender Dysphoria by a certified mental health professional. [R. 24-2 at 2; R. 24-3 at 2 ("*It is my understanding* that Plaintiff Maddilyn Marcum ("Marcum") has been diagnosed with Gender Dysphoria by a mental health professional.") (emphasis added).]

Prior to Marcum's sentencing, Marcum was held in a county facility where Marcum was not administered HRT. *Id.* Once in the Department of Corrections' (DOC) custody following sentencing, Marcum was again refused HRT under the DOC's "freeze frame" policy. [R. 4 at 6.] Under the "freeze frame" policy, a prisoner is entitled to receive HRT only if they were receiving HRT when they entered DOC's custody. *Id.* Thus, because the county jail refused to provide the Plaintiff with HRT during the pretrial incarceration, DOC found that Marcum was not receiving HRT prior to entering their custody and was not eligible to receive HRT. *Id.* In 2016, DOC reversed course and found that Marcum did qualify for HRT. *Id.* Marcum received treatment from 2016-2025.

2

The chain of command for DOC healthcare providers is convoluted. Appalachian Regional Healthcare (ARH), who is a Defendant in this action, contracts with Wellpath, who is not a party to this action, to provide telehealth endocrine services to inmates. [R. 24 at 1.] Among the services is treatment for Gender Dysphoria. *Id.* ARH, however, does not provide any in-person health services to inmates nor does ARH prescribe or administer medication—this job is left to the Wellpath providers, who are contracted by the DOC. *Id.* at 2

The Plaintiff's ARH providers are Dr. Edilfavia Uy and APRN Bonnie Ferguson. *Id.* The ARH providers are supposed to "receive a letter from a certified mental health professional that an individual has been diagnosed with Gender Dysphoria." [R. 24 at 2.] Prior to any telehealth appoints, ARH receives updated lab work from Wellpath along with the patient's Medication Administration Record. *Id.* After the virtual appointment, the ARH provider sends an Electronic Health Record note to Wellpath, who then sends the note to the inmate's Wellpath medical provider at the institution. *Id.* At this point, the DOC provider has complete autonomy to either accept or reject the recommendation to provide the medication recommended by ARH. *Id.*

In 2025, the Kentucky Legislature passed the Public Funds Ban. [R. 4 at 6.] Under the Public Funds Ban, "public funds shall not be directly or indirectly used, granted, paid, or distributed for the purpose of providing a cosmetic service or elective procedure to an inmate in a correctional facility." Ky. Rev. Stat. § 197.280(2). The statute defines "cosmetic service or elective procedure" as:

> any procedure, treatment, or surgery to enhance or alter the appearance of any area of the head, neck, and body, including but not limited to:
>
> 1. Prescribing or administering cross-sex hormones in amounts greater than would normally be produced endogenously in a healthy person of the same age and sex; and
> 2. Performing any gender reassignment surgery to alter or remove physical or anatomical characteristics or features that are typical for a person's sex in

3

> order to instill or create physiological or anatomical characteristics that resemble a different sex.

Ky. Rev. Stat. § 197.280(1). All argue that HRT falls squarely into the definition of a "cosmetic service or elective procedure" as defined by the statute. *See* Ky. Rev. Stat. § 197.280(1)(a)(1). The statute also affords medical professionals some discretion in determining how best to taper treatment in a manner that minimizes disruption to the inmate.[1] Ky. Rev. Stat. § 197.280(3).

After the passage of the Public Funds Ban, Wellpath and DOC "advised that, due to the new law, gender-affirming medication would not be administered by the detention facilities moving forward and they discussed ways to step the medication down." [R. 24 at 3.] Marcum most recently met with APRN Ferguson via Zoom on May 28, 2025. [R. 24 at 3.] At this visit, APRN Ferguson increased Marcum's Estradiol dosage from 11 milligrams every two weeks to 13 milligrams every two weeks—although her specific reasoning for such a decision is not in the record. APRN Ferguson notified Marcum that HRT would be eventually completely eliminated consistent with the Public Funds Ban but did not give a time frame for the discontinuation of HRT treatment.[2] *Id.* at 4. The Plaintiff had a follow-up appointment on August 13, 2025, where the Plaintiff was advised that HRT would be reduced by half and then completely eliminated in September 2025. [R. 11; R. 57-1 at 2.]

Since the Preliminary Injunction hearing, the Plaintiff has twice supplemented the Motion for Preliminary Injunction. [R. 44; R. 57.] In the first supplement, the Plaintiff included a variety of physician notes from past doctor's visits. Among other things, the notes indicate that

---

[1] The Court notes that the statute does not give a certain time by which treatment must be completely eliminated. When asked at the Preliminary Injunction hearing if treatment could be gradually tapered off over the course of five years, the Commonwealth stated that this is a possibility under the statute if determined to be necessary by a medical professional.

[2] When asked who determines the timeframe for tapering off the medicine, ARH said the inmate elects whether to taper off or not. However, the record is not clear how the timeline is set, the role ARH plays in setting the timeline, or the effect tapering off treatment has on the inmate.

the Plaintiff received treatment for "unspecified gender dysphoria" in 2018. [R. 43 at 3, 18.] The Plaintiff then filed a second supplement that included a Supplemental Declaration from Plaintiff Marcum. [R. 57-1 at 2.] In the Declaration, the Plaintiff noted

> [O]n August 15, 2025, I met with APRN Shannon Wiles and APRN Rick Richards. They are Wellpath employees, and they further clarified that my prescribed estrogen dosage would be reduced by one-half (from 11 mg to 5.5 mg) on August 18, 2025, and that the August 18, 2025 dosage would be the final dose of estrogen given to me. They further advised me that beginning August 18, 2025, my dosage of spironolactone would likewise be reduced by one-half (from 200 mg daily to 100 mg daily) for a period of one week, and then it, too, would be discontinued.

[R. 57-1 at 3.]

Marcum is asking for both a TRO and Preliminary Injunction, as well as a class action certification. [R. 3; R. 4.] As grounds, Marcum argues that the Public Funds Ban as it relates to the HRT ban violates the Eighth Amendment, which bans state actors from "'unnecessarily and wantonly inflicting pain' on an inmate by acting with 'deliberate indifference' toward the inmate's serious medical needs." *Blackmore v. Kalamazoo Cnty.*, 390 F.3d 890, 895 (6th Cir. 2004) (quoting *Estelle v. Gamble*, 429 U.S. 97, 104, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976)). The Commonwealth of Kentucky moved to intervene in this action, seeking to defend the constitutionality of Ky. Rev. Stat. § 197.280, which this Court granted. [R. 7; R. 13.] The Court denied Marcum's request for a TRO [R. 5] and set an expedited briefing schedule for the Preliminary Injunction Motion [R. 14]. Due to the individualized medical nature of this case, the Court also ordered the Plaintiff to produce medical records related to the Plaintiff's Gender Dysphoria to Defendants. [R. 21.] The Plaintiff and Commonwealth both filed supplemental briefings related to information contained in the medical records. [R. 41; R. 44.] The Court held a preliminary injunction hearing on August 5, 2025, and now the matter is ripe for review.

**II**

"A preliminary injunction is an extraordinary remedy which should be granted only if the movant carries his or her burden of proving that the circumstances clearly demand it." *Overstreet v. Lexington–Fayette Urban County Government*, 305 F.3d 566, 573 (6th Cir. 2002) (citing *Leary v. Daeschner*, 228 F.3d 729, 739 (6th Cir. 2000)) (cleaned up) ("[A] preliminary injunction involv[es] the exercise of a very far-reaching power . . .")). Because of the unique procedural posture brought on by a Motion for Preliminary Injunction, the Court notes that the nature and purpose of a preliminary injunction informs the analysis. As the Supreme Court has stated:

> The purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held. Given this limited purpose, and given the haste that is often necessary if those positions are to be preserved, a preliminary injunction is customarily granted on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits. A party thus is not required to prove his case in full at a preliminary injunction hearing.

*University of Texas v. Camenisch*, U.S. 390, 395 (1981). Therefore, the findings of fact and conclusions of law made by a district court in granting a preliminary injunction are not binding at a trial on the merits. *Id.* It is through this lens the Court makes the following findings of fact and conclusions of law.

To issue a preliminary injunction, the Court must consider whether: (1) the movant shows a strong likelihood of success on the merits; (2) the movant will suffer irreparable harm if the injunction is not issued; (3) the issuance of the injunction would cause substantial harm to others; and (4) the public interest would be served by issuing the injunction. *Overstreet*, 305 F.3d at 573. The Sixth Circuit noted that "[w]hen a party seeks a preliminary injunction on the basis of a potential constitutional violation, the likelihood of success on the merits often will be the

6

determinative factor." *City of Pontiac Retired Employees Ass'n v. Schimmel*, 751 F.3d 427, 430

(6th Cir. 2014) (quoting *Obama for Am. v. Husted*, 697 F.3d 423, 436 (6th Cir. 2012)).

The parties also seek a Preliminary Injunction that is consistent with the Prison Litigation

Reform Act (PLRA). The PLRA requires that:

> In any civil action with respect to prison conditions . . . the court may enter a
> temporary restraining order or an order for preliminary injunctive relief.
> Preliminary injunctive relief must be narrowly drawn, extend no further than
> necessary to correct the harm the court finds requires preliminary relief, and be
> the least intrusive means necessary to correct that harm. The court shall give
> substantial weight to any adverse impact on public safety or the operation of a
> criminal justice system caused by the preliminary relief and shall respect the
> principles of comity set out in paragraph (1)(B) in tailoring any preliminary relief.
> Preliminary injunctive relief shall automatically expire on the date that is 90 days
> after its entry, unless the court makes the findings required under subsection
> (a)(1) for the entry of prospective relief and makes the order final before the
> expiration of the 90-day period.

18 U.S.C.A. § 3626(a)(2). As the relevant statutory provision shows, injunctive relief in the

prison context has its own special circumstances Courts must consider in conjunction with the

traditional Preliminary Injunction factors. With this framework in mind, the Plaintiff argues that

the Public Funds Ban, Ky. Rev. Stat. § 197.280, is both facially and as-applied unconstitutional.

[R. 4 at 2.]

## A

### 1

"A facial challenge to a legislative Act is, of course, the most difficult challenge to mount

successfully, since the challenger must establish that no set of circumstances exists under which

the Act would be valid." *United States v. Salerno*, 481 U.S. 739, 746 (1987). "A facial

challenge is really just a claim that the law or policy at issue is unconstitutional in all its

applications." *Bucklew v. Precythe*, 587 U.S. 119, 138 (2019). The Plaintiff, although not

directly addressing the facial challenge in the Preliminary Injunction motion, does address the

argument in the Reply.  [R. 34 at 7.]  Marcum argues that "individuals [with Gender Dysphoria] for whom HRT is not medically indicated," do not fall into the category of people this statute applies to and should not be considered when evaluating a facial challenge.  [R. 34 at 8.]

The Plaintiff's point is well-taken, but this argument is predicated on a finding that all inmates who are prescribed HRT medically *require* HRT—a finding which this record presently cannot support.  The Plaintiff attempted to establish that HRT was medically necessary, but the primary showing was that the record is insufficiently developed for the Court to make that determination. The burden is on the Plaintiff to show a medical necessity and, as detailed below, Marcum simply has not.  Because the Court finds that the statute is applied constitutionally to the Plaintiff, it logically follows that there exist constitutional applications, such that a facial challenge cannot succeed.

Having found that the facial challenge fails, the Court next turns to the as-applied challenge.  The Eighth Amendment obligates prison authorities to provide medical care to incarcerated individuals, as a failure to provide such care would be inconsistent with contemporary standards of decency. *Estelle v. Gamble*, 429 U.S. 97, 103–104 (1976). The Eighth Amendment is violated when a prison official is deliberately indifferent to the serious medical needs of a prisoner. *Id.* at 104-05; *Comstock v. McCrary*, 273 F.3d 693, 702 (6th Cir. 2001). There are two components to an Eighth Amendment claim—the objective and the subjective.

**a**

The objective component requires a plaintiff to prove that the alleged deprivation of medical care was serious enough to violate the Eighth Amendment. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994).  The plaintiff must present enough evidence for a factfinder to evaluate the adequacy of the treatment provided and the severity of the harm caused by the allegedly

inadequate treatment. There must be "medical proof that the provided treatment was not an adequate medical treatment of [the inmate's] condition or pain." *Santiago v. Ringle*, 734 F.3d 585, 591 (6th Cir. 2013). This will often require "expert medical testimony . . . showing the medical necessity for" the desired treatment and "the inadequacy of the treatments" the inmate received. *Anthony v. Swanson*, 701 F. App'x 460, 464 (6th Cir. 2017).

Some circuits have classified Gender Dysphoria as a serious medical need, but many Circuits, including the Sixth Circuit, have not provided guidance. The closest the Sixth Circuit has come to addressing this issue is *Murray v. U.S. Bureau of Prisons*, where they recognized transsexualism as a medical disorder and noted that "transsexuals often have a serious medical need for some sort of treatment." *Murray v. U.S. Bureau of Prisons*, No. 955204, 1997 WL 34677, at *3 (6th Cir. 1997). At the point *Murray* was decided, Gender Dysphoria was not yet a coined term. [R. 20-1 at 10 ("In 2009, under DSM-IV, the condition concerning a mismatch between perceived gender identity and biological sex was called "Gender Identity Disorder." In the DSM-5, the closest similar condition is called "Gender Dysphoria.").] Thus, it is unclear under Sixth Circuit precedent whether Gender Dysphoria is a serious medical need.

Regardless, glaringly missing from the record is any indication that the Plaintiff was formally diagnosed with Gender Dysphoria. The Plaintiff's Declaration, coupled with the Declarations of Dr. Uy and APRN Ferguson, are used as the primary support of the formal diagnosis. The Plaintiff asserts that the initial diagnosis with Gender Dysphoria was "by a healthcare provider in 2009," but Marcum does not name the healthcare provider or provide any documentation of said diagnosis. [R. 4-2 at 2.] Similarly, Dr. Uy and Dr. Ferguson stated that it was their "understanding that Plaintiff Maddilyn Marcum ("Marcum") has been diagnosed with Gender Dysphoria by a mental health professional." [R. 27-2 at 2; R. 27-3 at 3.] In the

Plaintiff's Supplemental Briefing, the Plaintiff recounts several instances of receiving treatment for Gender Dysphoria. [R. 44.] Specifically, the Plaintiff notes that APRN Ferguson noted that Marcum "received psych letter documenting Gender Dysphoria." [R. 27-4 at 5.] The Court is not entirely sure what this entry means—is this letter recommending changing the Plaintiff's pre-existing course of treatment? Is this letter diagnosing the Plaintiff? Or is this letter a routine update given to providers?

Further, neither of the Plaintiff's supplements change the fact that the record remains underdeveloped. The physician notes indicate that the Plaintiff was diagnosed with "unspecified gender dysphoria" dating back to 2018. It is not clear whether "unspecified gender dysphoria" is different from "gender dysphoria." Regardless, the first supplement simply provides additional evidence of the factual predicate that this Court does not dispute—that the Plaintiff has been receiving treatment for Gender Dysphoria.

The second supplement, which indicates that the Plaintiff has stopped receiving HRT, likewise does not fill in the gaps in the Plaintiff's arguments. Most importantly, the statute as written, and as confirmed by the Government, leaves room for medical discretion to be exercised with respect to tapering off treatment. The Plaintiff attempts to argue that that the termination of HRT "is not based upon individualized medical judgment" because APRN Ferguson "does not medically recommend this course of action." [R. 57-1 at 2.] The obvious problem with this assertion is, based on the Plaintiff's Supplemental Declaration, APRN Ferguson was not involved in terminating Plaintiff's HRT treatment—APRN Wiles and APRN Richards were the providers who informed the Plaintiff that HRT would be eliminated. *Id.* at 3.

The Plaintiff ultimately argues that these instances are sufficient evidence that the Plaintiff was diagnosed with Gender Dysphoria. [R. 44 at 4.] But this puts the second step

before the first.  While all of these instances provide insight into the Plaintiff's course of care, which could be relevant to the adequacy of care received, it does little to establish the underlying diagnosis.  This is not to diminish the credibility of the treating providers, but the type of proof at issue requires more than a passing reference to the diagnosis—it requires substantive evidence of its initial determination or redetermination.  Put another way the Plaintiff is resting on inference, rather than proof.  Thus, apart from there being no binding case law finding Gender Dysphoria to be a serious medical need, the Plaintiff has failed to provide sufficient proof of a formal diagnosis with Gender Dysphoria, such that there cannot be a serious medical need.

**b**

Even if successful on the objective prong, a plaintiff must also show that the defendants acted with deliberate indifference.  The first question this Court raises is who is being evaluated under the deliberate indifference standard? Is it the Department of Corrections? The Legislature? Appalachian Regional Health?  When asked at the Preliminary Injunction hearing, the Plaintiff asserted the Department of Corrections should be who is evaluated under the deliberate indifference standard—and case law supports this contention.

In *Fields v. Smith*, 653 F.3d 550, 555 (7th Cir. 2011), the Plaintiff was similarly challenging a state statute banning HRT, *inter alia*, and the Seventh Circuit applied the deliberate indifference standard to the prison doctors noting that they "knew of the serious medical need but refused to provide hormone therapy because of Act 105."  *Fields*, 653 F.3d at 555.

*Fields* is distinguishable for two primary reasons.  First, the *Fields* opinion was premised on the fact that the "Defendants did not produce any evidence that another treatment could be an adequate replacement for hormone therapy."  *Fields*, 653 F.3d at 556.  Here, both parties acknowledge that Gender Dysphoria requires treatment and that there are other treatments

available to treat Gender Dysphoria.  According to Marcum's medical records, albeit limited at this point, Marcum has received mental health services aimed at alleviating the distress associated with Gender Dysphoria.  [R. 27-4 at 2 (noting the Plaintiff "is doing cognitive behavioral therapy and counseling"); R. 43 at 2 ("active in supportive psychotherapy").]  Further, at the Preliminary Injunction Hearing, the DOC noted that they allow social transitioning, which even the Plaintiff's expert noted as being highly beneficial for treating Gender Dysphoria.  [R. 4-1 at 7 ("Decades of scientific research and clinical experience have demonstrated that social transition and gender-affirming medical care can significantly relieve the distress of gender dysphoria.").]  Second, the postures of the cases are different.  *Fields* proceeded through trial, allowing the district court to compile a full factual record, including expert testimony and cross-examination.  *Fields*, 653 F.3d at 553.  In this case, the Court is asked to make a decision in a complex matter on a very limited record.

Although *Fields* is distinguishable and non-binding, it is instructive on how Courts should apply the deliberate indifference standard when a statute is allegedly violative of the Eighth Amendment.  Thus, the Court applies the deliberate indifference standard to the DOC, and by extension ARH medical providers.[3]

With respect to DOC, the Plaintiff has provided no Declarations of prison medical personnel, or any other evidence against DOC showing deliberate indifference.  The Plaintiff argues that the following demonstrates that DOC had a subjective awareness and conscious disregard of the Plaintiff's serious medical need:

---

[3] The Court is aware there is a pending Motion to Dismiss [R. 37] filed by ARH.  However, the Court finds that the deliberate indifference standard applied to either DOC or ARH is the same result—there is no evidence at this juncture that either entity was deliberately indifferent towards the Plaintiff.  A prerequisite of *Monell* liability is determining whether there was a constitutional violation in the first place.  Because Plaintiff is only seeking to enjoin enforcement of Ky. Rev. Stat. § 197.280, the Court only reaches this preliminary issue of constitutionality and declines to address *Monell* liability at this juncture.

(a) DOC previously withheld HRT care from Plaintiff in 2015, but it reversed course the following year after its Health Care Administration Review Team reviewed Plaintiff's case and agreed that her HRT treatment should be resumed [Compl., at ¶ 38-40]; (b) since 2016, Plaintiff received HRT care under the supervision of DOC-provided healthcare providers while in DOC's custody.

[R. 4 at 13.]  At the Preliminary Injunction hearing, the Plaintiff analogized HRT to insulin—saying that for some patients with diabetes exercise and diet is all that is necessary, but for others insulin is required.  So, it follows that for some individuals with Gender Dysphoria therapy and social transitioning are enough, but for others HRT is required.  The problem in making this analogy is that the Plaintiff is assuming that HRT is a well-settled area of medicine.  When, in fact, the record indicates that there remains significant disagreement about whether the side effects and the negative consequences of HRT outweigh the positive benefits.  And, further, there is medical evidence suggesting that even if HRT is not provided, there are other ways to care for an individual diagnosed with Gender Dysphoria, absent using HRT.  [R. 20-1 at 12 ("ICD-11s gender incongruence definition also states that 'other healthcare services' besides hormonal and surgical treatment could be used to make the person's body align with gender which would not rule out psychotherapy or cognitive behavioral therapy alone as potential remedies for this condition.")].  Thus, there is no evidence that the DOC implementing the HRT ban would constitute deliberate indifference.

Applying the deliberate indifference standard to the ARH physicians, the Court does not find them to have acted with deliberate indifference in light of the expert medical opinions.  A doctor's errors in medical judgment or other negligent behavior do not suffice to establish deliberate indifference.  *See Estelle*, 429 U.S. at 107–08.  Instead, the plaintiff must show that the defendants acted with a mental state "equivalent to criminal recklessness."  *Santiago*, 734 F.3d at

591 (citing *Farmer*, 511 U.S. at 834, 839–40). This showing requires proof that each defendant "subjectively perceived facts from which to infer substantial risk to the prisoner, that he did in fact draw the inference, and that he then disregarded that risk" by failing to take reasonable measures to abate it. *Comstock*, 273 F.3d at 703 (citing *Farmer*, 511 U.S. at 837). There is no deliberate indifference "if a genuine debate exists within the medical community about the necessity or efficacy" of a given treatment. *Gibson v. Collier*, 920 F.3d 212, 220 (5th Cir. 2019).

Both sides have presented their own medical experts who opine on their recommended course of treatment for Gender Dysphoria. The Plaintiff has included an opinion from Dr. Dan H. Karasic, who is a Professor Emeritus of Psychiatry at the University of California. [R. 4-1 at 3.] The Commonwealth has included an opinion from Dr. Michael Laidlaw, who is a board-certified endocrinologist. [R. 20-1 at 3.] The Court first addresses Dr. Karasic's opinion.

Dr. Karasic relies heavily on the research done by the World Professional Association for Transgender Health (WPATH), where he worked as a contributing author of the WPATH Standards of Care, Versions 7 and 8. [R. 4-1 at 7.] In his opinion, Dr. Karasic grounds his conclusion in the Standards of Care for the Health of Transexual, Transgender, and Gender Nonconforming People (WPATH SOC 8). [R. 4-1 at 12.] Dr. Karasic ultimately concludes Ky. Rev. Stat. § 197.280 "is contrary to widely accepted evidence-based medical protocols for the treatment of gender dysphoria and puts these individuals at risk of significant harm, including heightened risk of depression, self-harm, and suicidality." [R. 4-1 at 20.]

At this juncture, the court finds that Dr. Karasic's expert opinion is credible. Dr. Karasic provided an initial report, totaling 21 pages. Dr. Karasic provides sufficiently detailed observations, assessments, and recommendations based on his clinical experience and peer-reviewed research. Dr. Karasic's qualifications and resume show decades of experience with

Gender Dysphoria. [R. 4-1 at 22.] However, while the Court finds Dr. Karasic's opinion credible, the Court has doubts as to the relevance of some of his conclusions as it pertains to this case.

Dr. Karasic does not provide reference to the Plaintiff or the Plaintiff's medical records, nor does he discuss the tapering mechanism provided in the statute. If this process is as medically individualized as the Plaintiff acknowledges [R. 34 at 5 (noting that HRT prescription and administration "is (or should be) an individualized medical decision"), Dr. Karasic's opinion is not very helpful in parsing through the Plaintiff's individual medical needs as it relates to Gender Dysphoria. Further, Dr. Karasic also notes that he "is aware of no basis in medicine or science for categorically prohibiting gender-affirming medical care." [R. 4.1 at 18.] However, the Public Funds Ban is not a categorical ban on HRT. It is a ban on using public money to fund HRT treatment. The Plaintiff, if so inclined, could still receive HRT paying out of pocket, absent an internal DOC policy saying otherwise.[4]

Dr. Laidlaw, the Commonwealth's medical expert, called into question WPATH, the research method underlying the majority of Dr. Karasic's opinion. Dr. Laidlaw concludes "[t]here exists insufficient evidence of [the] benefit of GAT, but serious concerns for risk of harm. Persons affected by the law can still be treated by standard medical and psychological interventions. Therefore, I believe that Kentucky's Revised Statute § 197.280(2) and (3) is based on sound medical principles for the protection of human persons." [R. 20-1 at 39.] The Court finds Dr. Laidlaw's opinion to also be credible at this juncture. He has extensive experience researching gender dysphoria and his opinion discusses in depth the potential side effects

---

[4] When asked whether an inmate could pay for Gender Dysphoria treatment out of pocket at the Preliminary Injunction hearing, the DOC said that they thought this could be an option, but there is no set policy as this is a developing area of law.

surrounding cross-sex hormones, as well as the problems he sees with relying on WPATH and the Endocrine Society in forming medical opinions. [R. 20-1 at 25 ("WPATH has functioned primarily as an advocacy organization for promoting social and political activism rather than as a strictly scientific organization."); R. 20-1 at 27-28 ("It is notable that the Endocrine Society never claimed that its guideline should be considered a standard of care. In fact, quite the opposite. The Endocrine Society states that its 'guidelines cannot guarantee any specific outcome, nor do they establish a standard of care.'"). Unlike Dr. Karasic, Dr. Laidlaw made fact-specific inquiries into the Plaintiff's medical records. [R. 41-2.] And, at the very least, the Court finds that Dr. Laidlaw's opinion reasonably calls into question the research methodology underlying Dr. Karasic's opinion.

Cases involving dueling medical experts will typically not support an Eighth Amendment claim. In fact, credible dueling experts seem to be strong proof that there is not a medical consensus as to the standard of care required to treat Gender Dysphoria. *See Gibson*, 920 F.3d at 220 ("There is no intentional or wanton deprivation of care if a genuine debate exists within the medical community about the necessity or efficacy of that care.").

At the Preliminary Injunction hearing, the Plaintiff rested on the fact that there is only one dissenting medical opinion (Dr. Laidlaw) and three medical opinions (Dr. Karasic, APRN Ferguson, and Dr. Uy) who are in favor of continuing HRT treatment. The Court finds three problems with this conclusion. First, there is no evidence that either APRN Ferguson or Dr. Uy specialize in researching Gender Dysphoria as neither of their CV's are in the record and there remains questions about the level of their involvement in the Plaintiff's care since their opinions simply operate as a recommendation for DOC providers, who are actually treating the Plaintiff. [R. 27 at 2.] Second, while a single dissenting expert does not "automatically defeat[] medical

16

consensus about whether a particular treatment is necessary in the abstract," it does demonstrate at this early stage that there is a "robust and substantial good faith disagreement dividing respected members of the expert medical community." *Gibson*, 920 F.3d at 220. Last, neither Dr. Uy nor APRN Ferguson ever definitively stated that they would not be able to adequately care for the Plaintiff absent HRT.

Thus, the Plaintiff has failed to show that the treatment received amounts to a conscious disregard of the risk the Plaintiff faces. When "a doctor orders treatment consistent with the symptoms presented and then continues to monitor the patient's condition, an inference of deliberate indifference is unwarranted." *Self v. Crum*, 439 F.3d 1227, 1232–33 (10th Cir. 2006). Here, the Plaintiff has provided no evidence that the doctors are treating the Plaintiff inconsistent with the diagnosis. Again, just because the Plaintiff would like to receive a certain type of treatment, does not mean there is a constitutional right to receive said treatment.

**2**

The next factor is irreparable harm. "That factor is indispensable: If the plaintiff isn't facing imminent and irreparable injury, there's no need to grant relief now as opposed to at the end of the lawsuit." *D.T. v. Sumner Cnty. Schools*, 942 F.3d 324, 327 (6th Cir. 2019). To establish an irreparable injury, the Plaintiff must show that the injury is "'both certain and immediate,' not 'speculative or theoretical.'" *Id.* (internal citation omitted). The Plaintiff argues that cessation of treatment will cause "exacerbation of their Gender Dysphoria and the clinically significant distress associated with it, increased risk of depression, anxiety, self-harm (including attempts to self-castrate), and suicidality." [R. 4 at 15.] The Plaintiff also argues that if a constitutional violation is found under the first factor, the finding of irreparable injury is mandated. *Id.* Conversely, the Defendants argue even though the Plaintiff experienced adverse

side effects the first time HRT was stopped, this was over ten years ago and was an abrupt discontinuation. [R. 20 at 10-11.] It is not certain that the Plaintiff would experience similar side effects this time. *Id.*

The Court agrees with the Defendants that the Plaintiff has not met the burden of showing the alleged injury is certain and immediate. First, the Plaintiff compares the past symptoms when taken off HRT in 2014 to the likely symptoms that will be experienced if taken off HRT again [R. 4-2 at 5 ("This abrupt reversal of care threatens my health and safety all over again.")], but the record does not verify that the Plaintiff suffered any of these symptoms. Further, the circumstances in the first instance are easily distinguishable from the present—the Plaintiff was abruptly taken off HRT and newly incarcerated, which is an undoubtedly stressful and unique experience. [R. 4 at 6.] Thus, the Court does not find relying on the Plaintiff's prior side effects compelling enough to create an inference that the injury in this case is "certain" and "immediate."

Second, there is no indication one way or the other of the effect that tapering HRT will have on the Plaintiff's symptoms. Last, even if the Plaintiff experiences similar symptoms, there is no indication in the expert opinions or record that these side effects rise to the level of irreparable. Courts issue preliminary injunctions so "that an injury may not be done, which it may be out of our power to repair." *EOG Resources, Inc. v. Lucky Land Management, LLC*, 134 F.4th 868, 883 (6th Cir. 2025) (internal citation omitted). There is no evidence that the alleged injury could not be undone after this case reaches its natural conclusion. In fact, the record indicates that the Plaintiff was taken off HRT for two years, put back on HRT, and the medical records indicates Marcum is stable [R. 27-4 at 2 (noting at the most recent telehealth visit the Plaintiff "is happy with her changes," "has good support from her friends," and "feels safe")],

18

which supports the notion that if taken off HRT again while this case proceeded through the system, any of the side effects the Plaintiff would suffer could be undone.

**3**

Because both parties combine their arguments relating to harm to others and the public interest, the Court will address both jointly.  The Plaintiff argues that the cessation of treatment would cause substantial suffering.  [R. 4 at 16.]  The Plaintiff also states that "neither the official capacity Defendants nor corporate Defendant will suffer any harm from abiding by their constitutional duty to provide medically necessary health care for Gender Dysphoria to Plaintiffs and the proposed class, as they were doing prior to the enactment of Ky. Rev. Stat. § 197.280." [R. 4 at 17.]  Last, the Plaintiff argues that "the public interest also weighs in favor of Plaintiff because the public has an interest in ensuring the continued dignity of incarcerated individuals." *Id.*

The Defendants argue "the General Assembly—the people's representatives—clearly believed that these statutory provisions were in the public interest because they serve both the financial interest and the health interest of the people" and absent a constitutional violation these types of decisions are well within the General Assembly's authority.  [R. 20 at 12.]  The Court agrees.  While the Court is sympathetic to the Plaintiff's argument that there may be side effects because of HRT being tapered off, prisons are uniquely positioned because they implicate important issues of comity and federalism.  *See Kendrick v. Bland*, 740 F.2d 432, 437 (6th Cir. 1984) ("[J]udicial deference is accorded not merely because the administrator ordinarily will, as a matter of fact in a particular case, have a better grasp of his domain than the reviewing judge, but also because the operation of our correctional facilities is peculiarly the providence of the

Legislative and Executive Branches of our Government not the Judicial.") (internal citation omitted).

Further, the PLRA imposes certain hurdles on prisoners seeking to challenge prison conditions.  If the Court grants injunctive relief, the relief must be "narrowly drawn," "extend[] no further than necessary," and "is the least intrusive means necessary."  18 U.S.C. § 3626(a)(2). Section 3626(a)(2) also provides that preliminary injunctive relief shall expire 90 days after its entry, unless the court makes additional findings.  The aim of both of these requirements seem to be to prevent judicially managed interventions in prison operations.  The very existence of the PLRA provides further proof of the public's strong interest in curtailing judicial overreach and ensuring respect for prison management.  Accordingly, the record is simply not developed enough to conclude that the harm to the Plaintiff will be severe enough to outweigh the important public interest in preserving comity and federalism.

### III

While a Preliminary Injunction does not require a fully developed record, it does require a clear showing of entitlement to relief before the Court can take the extraordinary step of enjoining a duly enacted state statute.  The Plaintiff asks the Court for a preliminary injunction preventing the enforcement of Ky. Rev. Stat. § 197.280. So far the Plaintiff has failed to show a likelihood of success on the merits of the claims due to an underdeveloped record.  Hence, the request for a Preliminary Injunction must be denied.  But, to be clear this is a preliminary decision not one that is final.  A final decision in this matter will have the benefit of a fully developed factual record.

The Plaintiff has also filed a Motion for Class Certification [R. 3] and Defendant ARH has filed a Motion to Dismiss [R. 37].  Because no injunctive relief has been

granted, the Court does not address these Motions here. These Motions, however, remain pending before the Court and will be addressed in subsequent opinions.

Accordingly, and the Court being otherwise sufficiently, it is hereby **ORDERED** that the Plaintiff's Motion for Preliminary Injunction **[R. 4]** is **DENIED**.

This the 12th day September 2025.

Gregory F. Van Tatenhove
United States District Judge